IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MARION REED, Individually and as Administrator of the Estate of Barbara C. Reed, JENNIFER EDSON, and RANDY REED, <br><br>　　　　Plaintiffs, <br><br>v. <br><br>REICHHOLD LIQUIDATION, INC. doing business as Liquidating Reichhold, Inc., <br><br>　　　　Defendant. | CIVIL ACTION NO. _____ |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

This is a lawsuit for damages from the personal injuries to Barbara Reed, Marion Reed, Jennifer Edson, and Randy Reed from exposure to asbestos sustained by Barbara Reed from 1972 to 1976. Ms. Reed was diagnosed with Mesothelioma on May 6, 2016 and died of Mesothelioma on August 21, 2017. Plaintiffs complain of Defendant and for causes of action would show the Court and Jury the following:

### PARTIES

1.　　Plaintiff Marion Reed is a resident of Iowa. Marion Reed appears in his individual capacity and as the Administrator of the Estate of Barbara C. Reed. Barbara Reed

and Mr. Reed were husband and wife at the time of Ms. Reed's death and had been married for 41 years.

2. Plaintiff Jennifer Edson is the adult daughter of Barbara and Marion Reed and is a resident of Iowa.

3. Plaintiff Randy Reed is the adult son of Barbara and Marion Reed and is a resident of Florida.

4. Defendant Reichhold Liquidation, Inc. doing business as Liquidating Reichhold, Inc. (hereinafter Reichhold) is a Delaware corporation and its principal place of business is in North Carolina. Defendant may be served via Roger Willis at Reichhold Liquidation Inc., 1035 Swabia Court, Durham, North Carolina 27705.

5. Defendant and its predecessors were engaged in the manufacture, sale, design, distribution, and use of asbestos-containing products or otherwise placed such asbestos-containing products into the stream of commerce where they reached Barbara Reed in a form intended and foreseen by Defendant.

## JURISDICTION

6. The court has subject matter jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

7. This Court has personal jurisdiction over Defendant because it is a North Carolina corporation.

## VENUE

8. Defendant's principal place of business is in the Middle District of North Carolina, therefore venue is proper in this District.

2

Case 1:18-cv-00720-WO-JLW   Document 1   Filed 08/20/18   Page 2 of 15

## ALLEGATIONS

9. Barbara Reed sustained regular, frequent, and intense exposure to Defendant's asbestos-containing materials while working in the Plastic Mold Cleaning Department and the Plastics Molding Department at the Square D manufacturing plant in Cedar Rapids, Iowa from 1972 to 1976.

10. Barbara Reed encountered Defendant's asbestos-containing products and materials and the dust they released into her breathing zone on a daily basis during the eight hour or longer shifts at the Square D plant. She worked on average five days per week for an approximately four and a half year period between March 1972 and August 1976.

### A. The Plastics Mold Cleaning Department: 1972-1973

11. For approximately the first year and a half from when she began work in March 1972, Ms. Reed worked in the Plastics Mold Cleaning Department at the Square D plant in Cedar Rapids, Iowa. The department was also referred to as the Sandblasting Department. Ms. Reed's job was to place recently molded asbestos-containing plastic parts into a sandblasting machine. The machine operated a Lazy Susan type of conveyer belt that rotated the parts through a sandblasting process to remove rough edges and excess plastic that remained on the molded parts, called "flash", from the newly molded asbestos-containing parts using sand or other similar abrasives.

12. After the parts completed the sandblasting cycle, Ms. Reed picked the parts up by hand and placed them under compressed air to blow out the sand or other remaining abrasive dust and plastic particles loosened by the sandblasting process. The compressed air came out of fixed valves that remained on at all times adjacent to the sandblasting conveyer belt machine because parts Ms. Reed had to continuously clean parts as she removed them from the sandblasting

3

conveyer belt.

13. The dust and particles blown out by the compressed air contained respirable asbestos fibers from Defendant's asbestos-containing molding compounds.

14. The sandblasting ran continuously while the bins of parts rotated through the cleaning process. The asbestos-laden dust generated from the process continuously flowed out of the opening of the machine where Ms. Reed was standing into the immediate ambient air she was breathing during the entire eight hour shift that she worked at the sandblasting station.

15. It was not uncommon for the sandblasting machine to become clogged at which time it would expel large amounts of dust into the ambient air because of the backup. When this occurred, it was necessary to turn off the machine while maintenance dislodged the clog and restored the machine to operation. The process of dislodging the clog released more of the accumulated dust into the air Ms. Reed was breathing.

16. After Ms. Reed removed the products from the sandblasting machine and moved the parts under the compressed air, Ms. Reed then had to file any remaining flash or rough edges to further refine the product to its finished state.

17. The filing off of this remaining flash and rough edges released additional respirable asbestos containing material and asbestos fibers into Ms. Reed's immediate breathing zone.

18. Lastly, Ms. Reed was required to hand paint the on/off indentations on the plastic parts in white paint. Fans positioned at each end of the painting table continuously blew on the freshly painted parts to expedite the drying process. However, this continuous air movement further circulated the asbestos containing dust that was present in the environment into the ambient air Barbara Reed was breathing.

19. At the end of each shift, Ms. Reed was required to use compressed air to blow off

the dust from the work surfaces and equipment and to sweep up the dust that had accumulated on the floor around her work station from the combination of sandblasting, compressed air cleaning, and sweeping. Asbestos fibers are aerodynamic and the blowing and the sweeping of the dust launched what asbestos containing dust had settled to the floor back into the ambient air and Ms. Reed's breathing zone where she continued to inhale the asbestos laden dust on an ongoing basis.

20. Barbara Reed's inhalation of the asbestos dust released from all these work processes was a substantial contributing factor in the development of her mesothelioma.

21. The sustained and regular circulation of asbestos dust from the continuously operating compressed air nozzles and fans and the sand blasting machine dispersed asbestos laden air into Barbara Reed's breathing zone. Her inhalation of that asbestos dust during her eight hour shifts five days a week over a four year period was a substantial contributing factor in the development of her mesothelioma.

### B. The Plastic Molding Department: 1973-1976

22. Beginning sometime in the latter half of 1973 to August 1976, Ms. Reed worked in the Plastics Molding Department where she fabricated plastic molded parts for electrical circuit breakers.

23. At the time of the Square D plant's peak performance, there were approximately 55 automatic presses and 18 semi-automatic or manual presses. Automatic, semi-automatic or manual hydraulic presses operated in this department on a continuous basis during her work shift making various circuit breaker parts. The molding department was a story and a half high.

24. Defendant's asbestos-containing molding compounds were used in the presses.

### C. The Automatic Presses

25. The automatic presses ran on a cycle, and would do so throughout an entire shift.

5

The automatic presses were large and varied in size, weighing from 20 tons to approximately 300 tons and were roughly four feet wide by seven or eight feet tall.

26. A forklift would lift a full pallet of molding compound ten or 12 feet off the ground, and a plant worker, sometimes called a "set-up man", would cut the sacks, dumping the compound into a press's hopper. Twenty-eight presses were filled that way each work shift and were filled multiple times throughout a shift.

27. The process of filling a press with molding compound created airborne dust. This dust would remain in the air for several hours after each round of compound was dumped into the presses' hoppers. Many fans were located throughout the molding department that continually circulated this asbestos laden dust into the breathing zones of workers including Barbara Reed.

### D. The Manual Presses

28. The manual presses required an employee – usually a female plant employee – to open and close the presses to remove completed parts and refill the compound material. Employees would not have to manually open and close semi-automatic presses, as those also operated on a timer; but the workers would have to remove the finished part, blow off any residue ("flash"), and refill the molding compound to reset the machine.

29. Ms. Reed's job was to open large Gaylord boxes of dry asbestos-containing plastic molding compound material, open the plastic liner inside the box and then remove blocks of asbestos-containing plastic molding compound. The opening of the boxes released asbestos containing dust into the ambient air Ms. Reed was breathing.

30. The material came in various forms but at times was in the shape of briquettes. Ms. Reed had to measure the precise amount of material needed to fill a mold by weight. Individual blocks or briquettes were never the exact amount of material needed for a particular mold and thus,

6

Ms. Reed had to break the blocks or briquettes in order to obtain additional material to reach the correct weight for the particular part she was molding that shift.

31. Each time Ms. Reed broke a piece of the molding compound material, the breaking process released visible dust as well as microscopic asbestos particles and fibers that were a part of the dust into the air in Ms. Reed's breathing zone and she breathed the dust.

32. Once she determined the correct amount by weight, Ms. Reed placed that asbestos-containing plastic molding material into the mold.

33. While the machine was heating and compressing the plastic part to mold it into the product, Ms. Reed was required to quickly file off prominently visible flash and the roughest edges of the molded part that she had removed from the mold before placing the part into the finished product bin.

34. Those products were then taken to the sandblasting department where they underwent further finishing in a manner consistent with Ms. Reed's first assignment at the Square D plant described above.

35. In addition to the plastic molding compounds Ms. Reed handled herself, larger automated machines were operating in the Plastic Molding Department adjacent to where Ms. Reed worked.

36. In addition to the asbestos released into the ambient air during Barbara Reed's shift, the plant operated around the clock with three full time shifts. There were approximately eight to 12 other women working the manual presses during Barbara Reed's shift whose work activities released similar amounts of asbestos-containing dust into the ambient air.

37. The processes of handling asbestos-containing molding compounds by individuals loading small individual manually operated presses described above and workers filling the

7

hoppers of the automated machines continued during the all three shifts. These processes released asbestos laden dust into the ambient air on a continuous basis during a twenty-four hour period so the air Barbara Reed was breathing was constantly filled with respirable asbestos fibers.

### E. The Compressed Air and Sweeping of Asbestos Dust

38. Compressed air nozzles continually operated and the forced air from the fans and compressed air nozzles blew the dust around that entire area. This dust was circulated further when the presses were opened at the end of a cycle and the machines were cleaned off with air hoses and brooms. Significant amounts of dust would accumulate in the molding department from the operation and cleaning of the presses. That dust often collected on pipes, beams, and light fixtures throughout that department's worksite.

39. During Barbara Reed's shifts, the dust was so prevalent that clothing would be covered with dust from the plastic molding compounds.

40. The asbestos fibers released into the air remained in the ambient air in the plant because asbestos fibers are aerodynamic. As a result of their aerodynamic properties, they float in the ambient air for weeks or months or years. Even after the asbestos fibers initially settle on a surface, these fibers are easily disturbed by movement such as fans, compressed air, sweeping or other human activity and relaunched into the air where they circulate through the breathing zones of every person working nearby, including Ms. Reed.

41. Barbara Reed's inhalation of the asbestos dust released from the handling of asbestos-containing molding compounds by her and by her coworkers was a substantial contributing factor in the development of Barbara Reed's mesothelioma.

### F. Barbara Reed's in-home exposure to asbestos from her work clothes: 1972-1976

42. Ms. Reed wore her own work clothes to work at the plant. Square D did not provide

8

any kind of work uniform, coveralls or other protective clothing.

43. The work environment was often hot because of the heat released from the high temperature presses and caused workers such as Ms. Reed to perspire significantly dampening her clothing. As a result, substantial asbestos containing dust that filled the ambient air from the work processes and the insulation contracting work adhered to her damp clothes and person. When Barbara Reed left the work premises, she carried the asbestos fibers into her car where some were released and then into her home where the remaining asbestos fibers were released.

44. Once these asbestos fibers were released into her car and home, they remained there indefinitely causing ongoing exposure to asbestos.

45. Ms. Reed did her own laundry and the process of laundering her clothes involved brushing them off and shaking them out before placing them into a washing machine. Unknown to Ms. Reed, that process released additional asbestos fibers into the air she was breathing in her home, adding to the amount of asbestos she inhaled. Barbara Reed's inhalation of this asbestos dust was as substantial contributing factor to her development of mesothelioma.

46. Barbara Reed's sustained continuous exposure to Defendant's asbestos-containing molding compounds while she was in the Square D plant or in her home.

47. She worked approximately five days per week, eight hours per day between March 1972 and August 1976 in the Square D plant.

48. Barbara Reed's sustained exposure to asbestos containing dust from Defendant's asbestos-containing plastic molding compounds virtually every work day.

49. As a worker in the Plastic Mold Cleaning Department, also known as the Sandblasting department, and then in the Plastic Molding Department, Barbara Reed worked in close proximity to the airborne asbestos fibers in the air she was breathing during her eight hour

9

shift, five days per week, over a four year period.

50. Each of the sources of Barbara Reed's exposure to asbestos was a substantial contributing factor to her development of mesothelioma. As a result of her mesothelioma, Plaintiffs have suffered damages in the following respects.

51. Barbara Reed endured great pain and suffering from the date of her diagnosis until her death.

52. Barbara Reed's life expectancy was severely shortened and she was disabled and unable to continue gainful employment from which she received great mental satisfaction and substantial economic support.

53. Barbara Reed's relationships with her husband Marion and her children Jennifer and Randy were severely compromised and diminished.

54. Barbara Reed incurred substantial medical expenses for the treatment of her mesothelioma.

## COUNT ONE – NEGLIGENCE

55. All of the allegations contained in the previous paragraphs are re-alleged herein.

56. The illnesses, disabilities and death of Barbara Reed were a direct and proximate result of the negligence of Defendant and/or its predecessors-in-interest in that said entities produced, sold, distributed and/or otherwise put into the stream of commerce asbestos-containing molding compounds and which Defendant knew, or in the exercise of ordinary care should have known, would be deleterious and highly harmful to Barbara Reed's health and well-being. Defendant was negligent in one, some and/or all of the following respects, among others, the same being the proximate cause of Barbara Reed's illnesses, disabilities and death:

(a) In failing to timely and adequately warn Barbara Reed of the dangerous

characteristics and serious health hazards associated with exposure to the asbestos in the asbestos-containing molding compounds;

(b) in failing to place timely and adequate warnings on the containers of asbestos-containing molding compounds and adequately advising of the dangers to health from inhaling the dust from the asbestos-containing molding compounds;

(c) in failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and/or safe method of handling and using the asbestos-containing molding compounds described above;

(d) in failing to develop and utilize a substitute material to eliminate asbestos fibers in the asbestos-containing molding compounds products described above;

(e) in failing to properly design, manufacture or market the asbestos-containing molding compounds products described above for safe use under conditions of use that were reasonably anticipated and foreseeable despite knowledge of the unsafe and dangerous nature of such products;

(f) in failing to properly test the asbestos-containing molding compounds before they were released for use by persons such as Barbara Reed;

(g) in failing to recall and/or remove from the stream of commerce the asbestos-containing molding compounds, despite knowledge of the unsafe and dangerous nature of such products.

## COUNT TWO - STRICT LIABILITY

57. All of the allegations contained in the previous paragraphs are re-alleged herein.

58. Defendant had actual knowledge that its asbestos-containing molding

11

compounds were unreasonably dangerous without an adequate warning because of the defects in design, manufacturing and/or marketing of its asbestos-containing molding compounds.

59. In addition, by 1972, federal regulations issued by federal agencies applicable to Defendant's business activities with regards to asbestos-containing molding compounds informed Defendant of the risks from inhaling the dust generated by the use and manipulation posed to workers and other persons who inhaled the asbestos fibers.

60. Defendant's asbestos-containing molding compounds were the proximate cause of Barbara Reed's mesothelioma and subsequent death from the disease. Plaintiffs would show that the condition of the products and lack of adequate warnings rendered such products defective in design, manufacture and marketing, making them unreasonably dangerous for their intended and foreseeable use. Defendant placed such products into the stream of commerce and they reached Barbara Reed in such defective condition without substantial change.

61. Defendant should have known, and in fact did know, that workers such as Barbara Reed would use asbestos-containing molding compounds without inspection for defects and in fact, Defendant should have known, and in fact did know, persons in Barbara Reed's position would not be able to detect such defects. By placing them on the market, Defendant represented that the asbestos-containing molding compounds were safe for the job for which they were intended, which must necessarily include safe manipulation and use for molding products.

62. Barbara Reed was unaware of the hazards and defects in the asbestos-containing products of Defendant that made them unsafe for the purposes of use and

manipulation.

63. Barbara Reed and her co-workers utilized the asbestos-containing molding compounds in a manner which Defendant intended even though Defendant knew that using the asbestos-containing molding compounds as intended was unreasonably dangerous to the user.

64. Defendant's asbestos-containing molding compounds lacked adequate warnings or had insufficient warnings that rendered them defective and unreasonably dangerous. Defendant had actual knowledge of the design and intended use of its asbestos-containing molding compounds as well as actual knowledge that the final product was unreasonably dangerous without an adequate warning.

## COUNT THREE – WRONGFUL DEATH

65. Barbara Reed's death was the result of Defendant's reckless conduct. Barbara Reed's inhalation of the asbestos dust released from the handling of Defendant's asbestos-containing molding compounds by her and by her coworkers was a substantial contributing factor in the development of Barbara Reed's mesothelioma.

## DAMAGES

70. The conduct of Defendant, as alleged, was a direct, proximate and producing cause of Barbara Reed's asbestos-related disease, namely mesothelioma, and subsequent death, and of the following general and special damages that Plaintiffs have sustained:

   a) The hospital, medical, pharmaceutical, and other expenses incurred as a result of Barbara Reed's mesothelioma and other related physical conditions, according to proof;

   b) Barbara Reed's funeral, burial, internment or cremation expenses;

13

c)  Barbara Reed's lost income from the time of her illness until her death;

d)  the net pecuniary loss the Plaintiffs suffered a result of Barbara Reed's debilitating illness, incapacitation and death from mesothelioma had she lived and continued to work;

e)  the economic value of the services that Barbara Reed, as a wife, mother, and grandmother, had she lived, would have provided to Plaintiffs as determined by the sound sense and deliberate judgment of the jury, based on their own observation, experience and knowledge respecting these matters based on the facts and circumstances of this case;

f)  damages for grief, loss of companionship, impairment of the quality of life, inconvenience, pain and suffering, and emotional distress incurred by Plaintiffs, from the time of Barbara Reed's diagnosis to the time of trial, and into the future, for the maximum amount allowed by law according to proof, and further increased if justified by clear and convincing evidence therefore.

g)  the loss of relationship, love, comfort and consortium that Plaintiffs would have received from Barbara Reed had she lived;

h)  exemplary damages for gross negligence and malice to the extent allowable by law;

i)  for prejudgment interest from the date of the injury through judgment, and post judgment interest on the judgment at the maximum rate allowed by law.

### JURY DEMAND

71. Plaintiffs respectfully demands that all issues of fact in this case be tried to a properly impaneled jury and pays the jury fee.

### PRAYER

72. Based on the foregoing, Plaintiffs demand judgment against the Defendant severally, for general damages, special damages, for the costs expended herein, for prejudgment interest from the date of the injury through judgment, and post-judgment interest on the judgment at the maximum rate allowed by law, and for such other and further relief, both at law and in equity, to which Plaintiffs may show themselves justly entitled.

14

This 20th day of August, 2018.

>Respectfully submitted,
>WARD BLACK LAW
>
>/s/Janet Ward Black
>Janet Ward Black
>NC State Bar 12869
>208 W. Wendover Ave.
>Greensboro, NC 27401
>Phone: 336-333-2244
>Facsimile: 336-379-9415
>Email: jwblack@wardblacklaw.com
>Attorney for Plaintiffs